UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDSEY JULY,

                  Plaintiff,                 Civil Action No. 20-11989

v.                                            Denise Page Hood
                                            United States District Judge

COMMISSIONER OF
SOCIAL SECURITY,                        David R. Grand
                                            United States Magistrate Judge

                  Defendant.
_____/

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 15)

Plaintiff Lindsey July ("July") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF Nos. 12, 15), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

I.    **RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's ("ALJ") conclusion that July is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** be **DENIED**, July's Motion for Summary Judgment **(ECF No. 12)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN**

**PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

## II. REPORT

### A. Background

July was 35 years old at the time of her alleged onset date of July 10, 2017, and at 5'8" tall weighed approximately 205 pounds during the relevant time period. (PageID.129, 236, 256, 276).[1] She completed four years of college in a nursing program in 2010. (PageID.85, 257). Prior to that, she worked as a rental clerk; subsequently, she worked in nursing positions in a hospital and surgery center from approximately January 2011 until 2013, when she took a "sitdown job at a desk" performing nursing work for a pharmacy. (PageID.85-86). Eventually, she stopped working in July 2017 because of her medical conditions. (PageID.87, 257-58, 278, 291). She now alleges disability primarily as a result of back and neck pain, fibromyalgia, bipolar disorder, depression, and anxiety. (PageID.87-88, 91, 103, 130).

After July's application for DIB was denied at the initial level on June 11, 2018 (PageID.158-62), she timely requested an administrative hearing, which was held on April 11, 2019, before ALJ Kevin Fallis. (PageID.79-127). July, who was represented by attorney Ryan Kaiser, testified at the hearing, as did vocational expert ("VE") Merrill Cohen. (*Id.*). On August 21, 2019, the ALJ issued a written decision finding that July is

---

[1] Standalone citations to "PageID.___" are all to the administrative transcript in this case, which can be found at ECF No. 10.

not disabled under the Act. (PageID.53-64). On May 29, 2020, the Appeals Council denied review. (PageID.44-48). July timely filed for judicial review of the final decision on July 26, 2020. (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including July's medical record, function and disability reports, and testimony as to her conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### B. The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the

> impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that July is not disabled under the Act. At Step One, the ALJ found that July has not engaged in substantial gainful activity since July 10, 2017 (the alleged onset date). (PageID.55). At Step Two, the ALJ found that she has the severe impairments of degenerative disc disease, cervical, thoracic, and lumbar spine; fibromyalgia; rheumatoid arthritis; chronic anal fissures; irritable bowel syndrome; chronic sinusitis; obesity; bipolar disorder; depression; and anxiety with panic attacks. (*Id.*). At Step Three, the ALJ found that July's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (PageID.56).

The ALJ then assessed July's residual functional capacity ("RFC"), concluding that she is capable of performing sedentary work, with the following limitations: can lift up to

4

10 pounds occasionally, stand for about two hours and sit for about six hours in an eight-hour workday; can occasionally push or pull and operate foot controls; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs; can handle and finger frequently, bilaterally; must avoid all exposure to vibration, use of hazardous moving machinery, and unprotected heights; limited to jobs that can be performed while using a handheld assistive device required for uneven terrain or ambulation; limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decisions and routine workplace changes; can have only occasional interaction with the public; and is allowed additional bathroom breaks, so long as she is not off task more than 10% of the workday. (PageID.58).

At Step Four, the ALJ found that July is not capable of performing any of her past relevant work. (PageID.62). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that July is capable of performing the jobs of document preparer, microfilm (55,000 jobs nationally) and table worker (12,000 jobs). (PageID.63). As a result, the ALJ concluded that July is not disabled under the Act. (PageID.64).

### C. Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has

made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). The phrase "substantial evidence" is a "term of art …." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Id*. (internal citations omitted). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence … is 'more than a mere scintilla.'" *Id.* (internal citations omitted). Specifically, "[i]t means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (internal citations omitted).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be

6

affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**D.     Analysis**

July argues that the ALJ erred in rejecting the opinion of her treating physician, Kristin Nikolakeas, M.D.[2]  (ECF No. 12, PageID.1562-65).  On February 26, 2019, Dr. Nikolakeas completed a Medical Source Statement, which, as the ALJ noted, she prepared after she "evaluated [July's] medical records and treatment." (PageID.62).  Dr. Nikolakeas indicated, in relevant part, that July suffers from neck pain, middle and low back pain, lower extremity weakness, muscle and joint pains, depression, anxiety, dizziness, fatigue, and balance issues.  (PageID.1439).  Her diagnoses included lumbar facet arthropathy, cervical and lumbar disc disease, lumbar radiculopathy, and fibromyalgia.  (*Id.*).  Dr. Nikolakeas opined that July's conditions significantly restrict her activities of daily living and that prescribed medications have the side effects of diminished concentration, slowed thought, somnolence, and/or lethargy.  (*Id.*).  She further opined that July's impairments would cause her to miss work three or more work days per month; she is able to sit zero to two hours in a workday and stand zero to two hours in a workday; and she would have to lay down or take breaks six to eight hours in a workday.  (PageID.1440).  Dr. Nikolakeas

---

[2] July also argues that the ALJ erred in discounting her subjective complaints, evaluating the four areas of mental functioning set out in the disability regulations for evaluating mental disorders, and discounting the opinion of her treating psychologist, Jocelyn Starling, MA, LLP. (ECF No. 12).  Because the Court is recommending remand on other grounds, it need not address the merits of these arguments in detail.  On remand, however, the ALJ should take care to thoroughly consider each of these issues.

further opined that July can never lift/carry under ten pounds, use her feet for controls, reach above her shoulders, push or pull, bend, squat, crawl, or climb. (PageID.1441).

The regulatory criteria for weighing medical opinions with respect to claims filed on or after March 27, 2017, is set forth at 20 C.F.R. § 404.1520c. Specifically, ALJs "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) …. 20 C.F.R. § 404.1520c(a). Rather, ALJs must consider medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* These factors include:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.
>
> (3) Relationship with the claimant. This factor combines consideration of the issues in paragraphs (c)(3)(i) through (v) of this section….
>
> (4) Specialization. The medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.
>
> (5) Other factors. We will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding.

8

20 C.F.R. § 404.1520c(c). The most important factors in this analysis are a medical opinion's supportability and consistency with other sources in the record. 20 C.F.R. § 404.1520c(b)(2). Therefore, ALJs are required to explain how they considered the supportability and consistency factors for a medical source's medical opinions in the determination or decision. *Id.*

As an initial matter, it is important to note that the ALJ did not specify how much weight he gave Dr. Nikolakeas' opinion, although it appears likely that he gave it none. Specifically, the ALJ said the following about Dr. Nikolakeas' opinion:

> Dr. Nikolakeas['] opinion is unpersuasive as it is inconsistent with her clinical findings, which note the claimant has subjective pain complaint[s] but frequently presented with normal range of motion and strength. The evidence of record supports the findings contained herein.

(PageID.62). The ALJ did not cite to any specific record evidence in support of this finding, and a review of the record belies his conclusion in this respect.

July stopped working on July 10, 2017, because of increasing back pain. (PageID.88-89). Just five days earlier, she had been seen by a nurse practitioner, Rebecca Aaron, with complaints of severe low back pain "shooting down her left leg into her foot." (PageID.872). She was assessed with left lumbar radiculopathy, and an MRI of her lumbar spine was ordered.[3] (PageID.874). She was placed on FMLA leave and a TENS unit was prescribed. (PageID.810, 965).

---

[3] This MRI was performed on July 6, 2017 and showed minimal disc bulge and facet hypertrophy with moderate neuroforaminal stenosis at L4-L5, a superimposed left foraminal protrusion with annual tear at the same level, and minimal disc bulge and facet hypertrophy with moderate left neuroforaminal stenosis at L5-S1. (PageID.571).

9

On August 3, 2017, July saw Dianne Trudell, M.D., a rheumatologist, at the recommendation of her then-primary care physician, James Walker, M.D., who suspected she had fibromyalgia and believed further evaluation was appropriate. (PageID.509). On examination, there were numerous tender points to palpation with painful range of motion in most every joint. (PageID.510). Dr. Trudell recommended a trial of gabapentin, along with a course of physical therapy, and noted that July was scheduled to see neurosurgeon Jawad Shah, M.D. the following week regarding the results of her MRI. (*Id.*).

On August 10, 2017, July saw Dr. Shah, reporting ongoing back and neck pain with numbness and weakness. (PageID.551). On examination, she had full strength and intact sensation. (*Id.*). Dr. Shah recommended physical therapy[4] and chiropractic manipulation; if those failed, he suggested epidural steroid injections and, if ultimately necessary, surgery. (PageID.552). Dr. Shah believed July should remain off work for three months (and eventually extended this period to December 8, 2017). (PageID.552, 767).

July first saw Dr. Nikolakeas on August 22, 2017. (PageID.702). At that visit, her decreased activity and energy level were noted, as well as the fact that her husband had to help with personal care chores such as washing her hair. (PageID.704). She reported headaches; dizziness; muscle and joint pain, weakness, swelling, and stiffness; restriction of motion and arthralgias; and numbness and tingling. (PageID.706). On physical

---

[4] July did undergo physical therapy at the suggestion of both Dr. Trudell and Dr. Shah. The Commissioner claims that she "was not compliant with physical therapy, insofar as she gave minimal effort and exhibited pain-focused behavior that the therapist believed to be psychological, and not related to her physical limitations[.]" (ECF No. 15, PageID.1585). Although such notations were made, the record indicates that July discontinued physical therapy because the exercises were making her pain worse. (PageID.624).

10

examination, it was noted that she had 11/18 point tenderness for fibromyalgia; pain with palpitation of the lumbar spine; her gait was not intact;[5] and her mood was depressed, indifferent, and irritable. (*Id.*). She was started on duloxetine and buspirone for her mental impairments and continued on gabapentin for fibromyalgia. (PageID.707).

July returned to see Dr. Nikolakeas on September 20, 2017, reporting that her prescribed medications were making her fatigued and she continued to experience ongoing pain. (PageID.699). Her physical examination was identical (or virtually identical) to the previous visit. (PageID.700). Lumbar injections were discussed, but July did not want to undergo them. (*Id.*). Her gabapentin dosage was increased, and Dr. Nikolakeas opined that she should remain off work until November 20, 2017 – and possibly longer – because of her back pain and fibromyalgia. (*Id.*). At her next visit, on December 18, 2017, July again had the same physical examination results, including pain with palpation over her lumbar spine, and her medications were adjusted in the hope of relieving her pain. (PageID.827). On March 19, 2018, Dr. Nikolakeas noted that July's medications were helping her maintain and improve function, but she was still having "mood issues." (PageID.805). Her dosage of Abilify was increased, as she had failed increases in Cymbalta, Buspar, and Lexapro. (PageID.809). The same was true at a follow-up visit on May 17, 2018. (PageID.799).

On May 23, 2018, July presented for a consultative physical examination with Michael Geoghegan, D.O. (PageID.1113-16). She reported constant pain of the lumbar

---

[5] She used a cane, which had been prescribed. (PageID.706, 1074).

spine and fibromyalgia, as well as difficulty completing activities of daily living. (PageID.1113). She presented with a mild left-side limp and used an ambulation device. (PageID.1114). On examination, July had limited range of motion, decreased motor strength, and decreased grip strength bilaterally; she also had positive straight leg raise tests bilaterally in both the seated and supine positions. (PageID.1115-16). She had mild difficulty getting on and off the exam table and severe difficulty with heel and toe walking and squatting due to pain. (*Id.*).

On August 16, 2018, July returned to see Dr. Nikolakeas, reporting that a trial of Lyrica made her dizzy. (PageID.1457). She also reported that, nearly every day, she could not drive, perform activities such as cooking or cleaning, or attend to her personal care because of pain. (*Id.*). She further indicated that sometimes she is "bedbound and can't even walk 20 feet" and cannot lift more than five pounds due to severe pain. (*Id.*). Although her physical examination yet again had identical findings, Dr. Nikolakeas specifically indicated that July is "disabled from performing any meaningful work[.]" (PageID.1459). At her next visit to Dr. Nikolakeas, she reported cramping and pain in both wrists and tingling in her fingers. (PageID.1453). She was assessed with bilateral carpal tunnel syndrome, splints were prescribed, and she was again described as disabled from performing any meaningful work. (PageID.1455).

On January 8, 2019, July underwent an MRI of her cervical spine, which showed acquired cervical spondylosis, most pronounced at C6-C7 where a left paracentral protrusion effaced the ventral surface of the spinal cord, resulting in mild central canal and left lateral recess stenosis. (PageID.1422-23). On January 27, 2019, July met with Dr.

12

Shah to go over the results of that MRI. (PageID.1431-32). He noted that she had disc herniations in her cervical spine that might eventually require surgery, as well as disc bulging in her lumbar spine, but he wanted her to try a course of physical therapy prior to surgery.[6] (PageID.1432). At her initial physical therapy assessment on February 20, 2019, it was noted that she had decreased strength and range of motion, pain, faulty posture, decreased functional activity tolerance, impaired balance, and an abnormal gait. (PageID.1433-34). At an occupational therapy evaluation the same day, July reported requiring assistance from her husband with most activities of daily living, with strongly increased pain and fatigue on performance. (PageID.1437). She had upper extremity weakness, along with a positive Phalen's test and positive Finkelstein's test bilaterally. (*Id.*).

On June 3, 2019, July underwent another lumbar spine MRI at the request of Dr. Shah. (PageID.1519-20). It showed a bulging disc and facet hypertrophy producing moderate left-sided foraminal stenosis at L2-L3; bulging discs with foraminal herniation and an annular tear producing mild right and mild-to-moderate left-sided foraminal stenosis at L4-L5; and left paracentral herniation and facet hypertrophy at L5-S1, with left S1 nerve root impingement and moderate left-sided foraminal stenosis.[7] (PageID.1519-20).

On June 12, 2019, Dr. Shah performed surgery on July, including an anterior

---

[6] On February 14, 2019, July saw Dr. Nikolakeas again, who noted that she had cervical paraspinal hypertonicity and pain with range of motion in the cervical and thoracic spine. (PageID.1444).

[7] The record also contains an MRI of July's sacrum and coccyx, performed on June 3, 2020, which showed a bulging disc with left foraminal herniation at L4-L5 and a left paracentral herniation at L5-S1, with left S1 nerve root impingement. (PageID.1517-18).

cervical discectomy, interbody fusion, and standalone cage at C6-C7. (PageID.1525-26). At her first post-operative visit to Dr. Shah, on July 1, 2019, he noted that she had full strength, intact sensation, and that her wound was "well healed." (PageID.1522-23). She was directed to follow up in three months, at which point additional x-rays would be performed and physical therapy would be considered. (PageID.1523). One week later, however, Dr. Shah prescribed a bath/shower chair for July because she had decreased standing tolerance from her fibromyalgia, and upper extremity weakness from cervicalgia that did not permit her to safely exit a bathtub from a sitting position. (PageID.1528).

As noted above, despite all of this record evidence, the ALJ said only the following about Dr. Nikolakeas' opinion:

> Dr. Nikolakeas['] opinion is unpersuasive as it is inconsistent with her clinical findings, which note the claimant has subjective pain complaint[s] but frequently presented with normal range of motion and strength. The evidence of record supports the findings contained herein.

(PageID.62). While it is true that Dr. Nikolakeas' notes frequently mention normal range of motion and strength, it is equally true that, for the most part, these notes appear to have been copied and pasted from visit to visit, as they are virtually identical in all respects. (*E.g.*, PageID.700, 706, 798, 802, 826, 1454-55, 1458). Moreover, at times, both Dr. Nikolakeas and other medical providers noted reduced range of motion in July's cervical and lumbar spine (*E.g.,* PageID.510, 1115-16, 1434, 1437, 1444, 1528), facts that the ALJ did not mention. Indeed, the consultative examiner, Dr. Geoghegan specifically found that July had limited range of motion, decreased motor strength, decreased grip strength

14

bilaterally, and positive straight leg raise tests bilaterally. (PageID.1115-16).[8]

Moreover, despite briefly referring to July's MRI results ("Imaging of the claimant's spine showed foraminal stenosis, degenerative disease and mild scoliosis throughout, cervical spondylosis and some herniation in the claimant's lumbar and cervical spine"), the ALJ failed to mention other results of these imaging studies that revealed far more significant abnormalities. For example, a July 6, 2017 MRI of July's lumbar spine showed disc bulge and facet hypertrophy with moderate neuroforaminal stenosis at L4-L5; a superimposed left foraminal protrusion with annular tear at the same level; and minimal disc bulge and facet hypertrophy with moderate left neuroforaminal stenosis at L5-S1. (PageID.571). A January 8, 2019 MRI of July's cervical spine showed acquired cervical spondylosis, most pronounced at C6-C7 where a left paracentral protrusion effaced the ventral surface of the spinal cord, resulting in mild central canal and left lateral recess stenosis. (PageID.1422-23). And, a June 3, 2019 lumbar spine MRI showed a bulging disc and facet hypertrophy producing moderate left-sided foraminal stenosis at L2-L3; bulging discs with foraminal herniation and an annular tear producing mild right and mild-to-moderate left-sided foraminal stenosis at L4-L5; and left paracentral herniation and facet hypertrophy at L5-S1, with left S1 nerve root impingement and moderate left-sided foraminal stenosis. (PageID.1519-20). None of these objective findings were mentioned by the ALJ, and they support both July's claims of radicular pain, numbness, and tingling,

---

[8] The Commissioner asserts that, "Numerous clinical findings of providers other than Dr. Nikolakeas showed only mild or moderate limitations." (ECF No. 15, PageID.1590). However, none of the examples cited by the Commissioner were relied on by the ALJ.

as well as Dr. Nikolakeas' opinion that she would have difficulty sitting or standing for long periods of time or lifting and carrying even less than ten pounds. (PageID.1440-41).

The ALJ also minimized the significance of the surgery July underwent on June 12, 2019 – an anterior cervical discectomy, interbody fusion, and placement of a standalone cage at C6-C7. (PageID.1525-26). Indeed, the ALJ simply noted that, at her first post-operative visit to Dr. Shah, on July 1, 2019, she had full strength and her wound was "well healed." (PageID.56, 1522-23). The fact that she was healing as expected two weeks after such an invasive surgery fails to account for the years of debilitating neck and back pain she reported to her treating physicians, as well as the fact that surgery was ultimately deemed necessary for this condition. Indeed, July testified to severe neck pain with radicular pain, numbness, and tingling even after surgery and physical therapy. (PageID.91-92). The records show that July failed conservative treatment with physical and occupational therapy, as well as chiropractic manipulations, and she underwent a variety of medication adjustments due to side effects and the minimal relief they provided, all of which were noted by her doctors. (PageID.803, 816, 1251, 1259, 1439, 1455, 1457, 1459, 1474).

Based on all of the foregoing evidence, virtually none of which was discussed by the ALJ in detail, the Court cannot say that substantial evidence supports the ALJ's RFC finding. *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts

from its weight.'") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)); *see also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("a substantiality of evidence evaluation does not permit a selective reading of the record"). In this case, the ALJ rejected Dr. Nikolakeas' opinion with only a vague reference to the fact that her opinion was "inconsistent with her clinical findings, which noted [she] has subjective pain complaint[s] but frequently presented with normal range of motion and strength." (PageID.62). In making this finding, the ALJ failed to evaluate the supportability of Dr. Nikolakeas' opinion – including the specific supporting explanations contained in that opinion (PageID.1439-41) – as well as the consistency of that opinion with the other medical and nonmedical evidence in the record (including July's subjective complaints, positive clinical findings, objective imaging, failed treatment, statements from other providers, and eventual invasive surgery). Under these circumstances, the Court simply cannot find that the ALJ's evaluation of the key medical opinion in the case is supported by substantial evidence. As such, remand is required for a more even and thorough evaluation of the medical evidence.

### III. CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 15)** be **DENIED**, July's Motion for Summary Judgment **(ECF No. 12)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

Dated: June 25, 2021　　　　　　　　　　s/David R. Grand
Ann Arbor, Michigan　　　　　　　　　　DAVID R. GRAND
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge

# NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

# CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 25, 2021.

　　　　　　　　　　　　　　　　　　　s/Eddrey O. Butts
　　　　　　　　　　　　　　　　　　　EDDREY O. BUTTS
　　　　　　　　　　　　　　　　　　　Case Manager